UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and HOWARD McDOUGALL, Trustee, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 07 C 5941 ) |
| SCOFBP, LLC, a Kentucky corporation, MCOF/Missouri, LLC, a Kentucky limited liability company, and MCRI/Illinois, LLC, a Kentucky limited liability company, | ) Judge Rebecca R. Pallmeyer ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States" or "the Fund") operates a non-profit multi-employer pension plan. Plaintiff Howard McDougall is a trustee and sponsor of the Fund. (Pl.'s 56.1 Stat.) Defendant SCOFBP, LLC ("SCOFBP") is a now-defunct lumber and milling company, which was bound by collective bargaining agreements that required it to make contributions to the Fund on behalf of its employees. In October 2001, SCOFBP permanently shuttered its operations and ceased making contributions to the Fund. By doing so, SCOFBP incurred withdrawal liability to the Fund. SCOFBP and its parent company, Southern Cross and O'Fallon Building Products Company ("Southern Cross"), report that they currently have no assets and are, therefore, incapable of satisfying their liability. As a result, Central States seeks to recover from two other companies, MCOF/Missouri LLC ("MCOF") and MCRI/Illinois LLC ("MCRI") which, Plaintiffs urge, were under the "common control" of Southern Cross's owner, Michael Cappy, at the time that SCOFBP withdrew from the Fund.

The parties have filed cross-motions for summary judgment.[1] Plaintiffs claim that the undisputed evidence demonstrates that all of the corporate Defendants were under Cappy's common control at the time of the withdrawal. Defendants contend that the same evidence proves that they were not. Essentially, the parties dispute the meaning of the term "common control," as that phrase is used in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1371. As explained below, in the court's view, the evidence demonstrates that Cappy, and subsequently his bankruptcy estate, exercised common control over SCOFBP, Southern Cross, MCOF, and MCRI during the relevant periods. Thus, each company is jointly and severally liable for SCOFBP's withdrawal liability. The court therefore grants Plaintiffs' motion for summary judgment.

## **BACKGROUND**

Michael Cappy is a graduate of Harvard Business School and a sophisticated businessman who, for almost three decades, has specialized in "operating, refinancing, recapitalizing, acquiring, merging, developing, strategically and organizationally planning, marketing, and selling various businesses." *In re Cappy*, No. 99-31466, at 3 (Bankr. Ct. W.D. Ky., August 26, 2002) (Ex. E to Pl.'s 56.1 Stat.) Southern Cross was among these businesses. Prior to January 19, 1999, Cappy was the 100 percent owner of Southern Cross, and Southern Cross in turn owned 98 percent of SCOFBP. (Def. 56.1 Resp. at ¶ 22-23.) Cappy personally owned one percent of SCOFBP, and the remaining one percent was held by the MLC Family Trust III, a trust established by Cappy and for which Cappy was both the settlor and a beneficiary. (Trust III Document, Ex. 41 to Cappy Dep.

---

[1] On a motion for summary judgment, the court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir.2003). When parties file cross motions for summary judgment, the court is required to adopt a "Janus-like perspective," construing the facts and inferences in favor of the party opposing the motion. *See Miller v. Midland Credit Management, Inc.*, 621 F.Supp.2d 621, 626-27 (N.D.Ill.2009) (quoting *F.T.C. v. Cleverlink Trading Ltd.*, 519 F.Supp.2d 784, 792 (N.D.Ill.2007)).

2

at 1, 67.) Between 1996 and 1999, Cappy established and maintained at least three trusts–MLC Family Trust I, MLC Family Trust II, and MLC Family Trust III–for the benefit of himself and his family. (Trust I Documents, Ex. 37 and 38 to Cappy Dep.; Trust II Document, Ex. 40 to Cappy Dep.; and Trust III Document, Ex. 41 to Cappy Dep.) For each of these trusts, Cappy was both the settlor and a beneficiary.[2] (*Id.*; *In re Cappy*, Ex. E to Pl.'s 56.1 Stat., at 14.) He was also named "protector" of each trust, a designation that endowed Cappy with the power to "veto" any action by the trustee and to remove or replace the trustee at any time in Cappy's unfettered discretion. (*In re Cappy*, Ex. E to Pl.'s 56.1 Stat., at 7-8; Trust I Document, Ex. 37 to Cappy Dep., § 8-9; Trust II Document, Ex. 40 to Cappy Dep., § 8-9; Trust III Document, Ex. 41 to Cappy Dep. at 26-28; 54-55, 69.) The trustees were also granted discretion, subject only to Cappy's veto, to apply all of the trusts' assets for Cappy's benefit. (*Id.*) Thus, by the plain terms of the trusts themselves, Cappy maintained essentially complete control over the activities of the trustees and the assets in the trusts.[3]

Among the trust assets purportedly under Cappy's "protect[ion]" were controlling interests in Defendants MCOF and MCRI, two companies that own and lease real estate. MCOF owned the lumber yard in O'Fallon, Missouri that was used and leased by SCOFBP. (Def. 56.1 Resp. at 32.)

---

[2]   The MLC Family Trusts were settled under the laws of Bermuda, New Zealand, and the Cook Islands, respectively, all offshore jurisdictions that–unlike almost every state in this United States–allow settlors to benefit from their own trusts and to obtain spendthrift trust protection as insulation from potential creditors. *In re Cappy*, No. 03 C 6H, at 8-9 (W.D. Ky. Feb. 5, 2004) (Ex. F. to Pl.'s 56.1 Stat).

[3]   Defendants contend that Mr. Cappy established the trusts as "part of [his] estate planning process" and assert that "Mr. Cappy's role in each of the Trusts was limited." (Def.'s 56.1 Resp. at ¶ 9.) Whether Cappy did or did not actively exercise the powers available to him under the terms of the trusts does not concern the court here. Rather, the issue is whether Mr. Cappy did in fact reserve and maintain these powers of control and whether the assets and activities of the trusts may be attributable to him. As to this issue, Defendants acknowledge that the trust documents and the opinions issued in Cappy's bankruptcy proceedings "speak for themselves." (*Id.*) Those documents are unambiguous in stating that Mr. Cappy was empowered to control the trust assets for his own benefit if he chose to do so.

MCRI held and continues to hold parcels of land in Rock Island, Illinois, which it leases to a third-party company. (*Id.*)  As of January 1999, the MLC Family Trusts were, on paper, the owners of a 99 percent stake in MCOF, with Cappy owning the remaining one percent in his personal capacity. (Def. 56.1 Resp. ¶ 29-30.)[4]  Similarly, the MLC Family Trusts held a 99 percent ownership interest in MCRI, again with Cappy holding the remaining one percent. (*Id.* at ¶ 50-51.)[5]

On January 20, 1999, Cappy filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Western District of Kentucky. (Pl.'s 56.1 Resp. at ¶ 7.)  The bankruptcy was converted into a Chapter 7 bankruptcy on May 18, 2001, and a man named Michael Wheatley was appointed Trustee of Cappy's bankruptcy estate. (Id. at ¶ 8.)  Defendants contend that 100 percent of Cappy's shares of Southern Cross–the entire stock of the company–passed into the bankruptcy estate. (Def. Ans. to Interog. at ¶ 3, Ex. E to Pl.'s 56.1 Stat.)  Cappy testified that, as a result of this transfer, Wheatley assumed functional control over Southern Cross.[6]  (Cappy Dep. at 119-21.)  Before he filed for bankruptcy, however, Cappy had "conveyed a substantial portion" of his assets and interests in his other companies–including MCOF and MCRI–to the MLC Family Trusts. *In re*

---

[4] The purported ownership breakdown for MCOF is as follows: 51 percent was owned by MCOF Inc. (a holding company wholly owned by MLC Family Trust III), 48 percent was owned by Family Trust II, and one percent was owned by Cappy.

[5] The purported ownership breakdown for MCRI is as follows: 71 percent was owned by MLC Family Trust III, 28 percent was owned by MLC Family Trust II, and one percent was owned by Cappy.

[6] Defendants' arguments about whether Wheatley excised some measure of managerial discretion over Southern Cross are not material to the court's determination of whether the companies were under common control for ERISA purposes.  "Common control" is not concerned with decision-making in an abstract sense.  Rather, as the court explains below, common control under ERISA is determined based on the definitions set forth by the Pension Benefit Guarantee Corporation and the Secretary of the Treasury. *Cf. Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996) (quoting 17 C.F.R. § 240.12b-2 (1995)) ("The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.")

*Cappy*, Case No. 03 C 6H, at 4 (W.D. Ky. Feb. 5, 2004) (Ex. F. to Pl.'s 56.1 Stat).

On October 20, 2001, SCOFBP shut down its operations and ceased making contributions to the the Central States pension fund, thereby effecting a complete withdrawal from the Fund. (Def.'s 56.1 Resp. at ¶ 74.) In January 2002, as required by statute, Central States sent SCOFBP a demand notice for payment of the company's withdrawal liability. (Id. at ¶ 77.) The Fund sent follow-up demands to SCOFBP and Cappy in March and April 2002, but SCOFBP neither made the demanded payments nor initiated arbitration under ERISA to challenge its withdrawal liability.

In August 2002, after reviewing the trust documents for the MLC Family Trusts and the circumstances surrounding Cappy's asset transfers, the Bankruptcy Court for the Western District of Kentucky determined that Cappy's transfers to the trusts were fraudulent. (*In re Cappy*, Ex. E to Pl.'s 56.1 Stat., at 23-24.) "The trusts," the bankruptcy court explained, "failed to divide legal and beneficial interest to any of the assets residing within them to the extent Cappy has a beneficial interest in those assets." (*Id.* at 23.) Accordingly, the bankruptcy court declared the transfers "null and void" and ordered that the trust assets be returned to Cappy's bankruptcy estate. (*Id.* at 24.) The assets explicitly referred to in the bankruptcy court's order include 100 percent of the membership interest in SCOFBP, MCOF, and MCRI, and 100 percent of the corporation stock in the parent corporations who held those interests. (*In re Cappy*, Ex. E to Pl.'s 56.1 Stat., at 24.) The U.S. District Court for the Western District of Kentucky subsequently affirmed the bankruptcy court's ruling with respect to the trust assets, though on somewhat narrower grounds. The district court agreed with the bankruptcy court that Cappy was not entitled to spendthrift protection from his creditors under the trusts and that the asset transfers to the MLC Family Trusts were indeed fraudulent.[7] As such, the court concluded, the trust assets were "properly part of Cappy's estate."

---

[7] While the District Court agreed that the Bankruptcy Court "correctly" determined the transfers to be fraudulent, its decision is somewhat equivocal as to whether the trusts were to be treated as entirely void *ab initio* or whether the spendthrift provisions of the trusts alone were
(continued...)

(*Id.* at 26.)  As a result of the ruling, therefore, 100 percent of SCOFBP, MCOF, and MCRI were attributed to the Cappy's bankruptcy estate.  Plaintiffs now sue to recover SCOFBP's outstanding withdrawal liability under the theory that all of the defendant companies were under common control of either Cappy or his bankruptcy estate at the time of SCOFPB's withdrawal from the Fund.

## DISCUSSION

Under ERISA, 29 U.S.C. §§ 1001-1371, as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381-1461, an employer who ceases to contribute to a multi-employer pension fund is liable for withdrawal liability. *See Central States, Southeast & Southwest Areas Pension Fund v. Ditello*, 974 F.2d 887, 888 (7th Cir.1992). This liability is the employer's proportionate share of the "unfunded vested benefits" owed to its employees.  *Id.*; 29 U.S.C. § 1381.  Here, there is no dispute that SCOFBP completely withdrew from the Fund on October 20, 2001 and, as a result, incurred withdrawal liability under these provisions.  (Def. 56.1 Resp. At 74-75.)  The sole issue for the court to decide is whether Cappy's other companies may be held liable for SCOFBP's withdrawal, as well.  To answer this question, the court must apply Section 1301(b)(1) of the MPPAA, which provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. § 1301(b)(1). Congress enacted Section 1301(b)(1) to "prevent withdrawn employers from avoiding liability by fractionalizing their business operations." *Central States, Southeast and Southwest Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 793 (7th Cir. 1992).  Thus, each business under common control is jointly and severally liable for the withdrawal liability of the others.  *See Ditello*, 974 F.2d at 889.

---

[7](...continued)
rendered unenforceable.  (*In re Cappy*, Ex. E to Pl.'s 56.1 Stat., at 26, FN 29.) ("[I]t seems unnecessary to find that the transfers of [all the assets remaining in the trust] were invalid.  Under either [the fraudulent transfer or spendthrift invalidity] theory, the transfers will be part of Cappy's estate.")

To impose withdrawal liability on an organization other than the one originally obligated to the pension fund, two conditions must be satisfied: (1) the organization must be under "common control" with the obligated organization and (2) the organization must be a "trade or business." *Central States, Southeast and Southwest Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir 2001).

After thoroughly reviewing the record and the applicable law, the court is satisfied that Defendants may be held liable for SCOFBP's withdrawal. They meet the "common control" requirement. Prior to January 1999, each company was under Cappy's control despite the rather elaborate web of ownership interests that Cappy wove through the MLC Family Trusts. After Cappy filed for bankruptcy in January 1999, each company would have passed into the common control of Cappy's bankruptcy estate but for the fraudulent conveyance of his interests to the MLC Family Trusts. In light of the policy underlying Section 1301(b)(1) and the fact that the fraudulent asset transfers were adjudged to be "null and void," the court finds that Defendants were under "common control" for ERISA purposes both before and after Cappy's bankruptcy filing. In addition, the court finds that, contrary to Defendants' assertions, MCOF and MCRI are "trade[s] or business[es]" as ERISA uses that term.

**I.    Common Control**

A fundamental purpose of ERISA is to protect employees who have been promised retirement benefits from employers who seek to avoid their responsibilities to pay such benefits. *See Central States, Southeast & Southwest Areas Pension Fund v. Neiman*, 285 F.3d 587, 596 (7th Cir. 2002). The MPPAA furthers this interest by barring employers from "shirking their ERISA obligations by fractionalizing operations into many separate entities." *Bd. of Trustees of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987). ERISA authorizes the Pension Benefit Guarantee Corporation ("PBGC") to adopt regulations that are "consistent and coextensive" with the regulations prescribed by the Secretary of the

Treasury to determine whether businesses are under common control. 29 U.S.C. § 1301(b)(1). To that end, the PBGC has adopted the language set forth in Section 414(c) of the Internal Revenue Code, which identifies both "parent-subsidiary" and "brother-sister" organization groupings as forms of common control. 26 C.F.R. §1.414(c)-2. Under this provision, a "parent-subsidiary group" is one in which one or more "chains of organizations" are connected through a common controlling interest (80 percent of the stock). *Id.* A "brother-sister group" is one in which (1) "five or fewer persons who are individuals, estates, or trusts" own a controlling interest (at least 80 percent of the stock) in two or more organizations and (2) the same persons maintain "effective control" (at least 50 percent of the stock) over each organization. *Id.* The regulations also specifically address how ownership stakes held by trusts are to be attributed. Under the applicable provisions, interests owned by a trust are considered owned by the beneficiaries who have an actuarial interest of five percent or more in the organization interest, to the extent of such actuarial interest. 26 C.F.R. § 1.414 (c)-4(b)(3); *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Zacek Industries, Inc.*, No. 92 C 2253, 1994 WL 201042, at *1 (N.D.Ill. May 18, 1994). A beneficiary's "actuarial interest" is determined "by assuming the maximum exercise of discretion by the fiduciary in favor of such beneficiary and the maximum use of the organization interest to satisfy the beneficiary's rights." *Id*.

Under the regulations, Cappy is presumed to have had a near 100 percent actuarial interest in the MLC Family Trusts' assets because nothing in the trust documents limits the trustees' discretion to use all of trust assets for Cappy's benefit. This presumption reflects the reality that Cappy maintained a tremendous amount of control over the trusts and their assets. By their terms, Cappy had the power to veto the actions of the trustees and to replace them at his discretion. Even assuming, therefore, that the MLC Family Trusts are valid, they do not insulate Cappy's companies from joint and several liability. The ownership interests of the trusts are, thus, attributable to Cappy. On the other hand, assuming that the trusts were invalid at the time Cappy created them, Cappy

8

would have retained his 100 percent ownership interest in each of the Defendant companies that he purportedly transferred to the trusts. Either way, the companies were under Cappy's common control.

No matter how one chooses to dissect the complicated tangle of ownership interests that Cappy has constructed, the conclusion is the same: SCOFBP, MCOF, and MCRI are part of the same control group. Prior to January 1999, Cappy held or could be deemed to hold a complete ownership stake in each of those companies. Cappy owned 100 percent of Southern Cross, the controlling parent company to SCOFBP. He also maintained a total actuarial interest in the holdings of the MLC Family Trusts, which included 99 percent of the membership interests of both MCOF and MCRI. He retained the remaining one percent of each company in his personal capacity. Thus, Cappy (and no one else) maintained total, undivided control over all of the Defendant companies. Because Cappy had more than an 80 percent ownership in each of these companies, they were under common control for ERISA purposes.

Cappy's bankruptcy in January 1999 did not alter this fact. The bankruptcy did not act to divide Cappy's interests from those of the MLC Family Trusts. The bankruptcy court reviewing Cappy's transfers of his ownership interests to the trusts declared those transactions "null and void." The substance of this order was affirmed by the district court: the assets that Cappy sought to fractionalize by passing them off to the trusts were deemed by the district court to be "properly part of Cappy's estate." In effect, these rulings determined–and this court agrees–that the bankruptcy estate assumed Cappy's undivided controlling interests in SCOFPB, MCOF and MCRI upon Cappy's filing for bankruptcy.[8] Though the estate became the legal entity administering these interests as

---

[8] Plaintiffs have not specifically invoked the doctrine of *res judicata* with respect to the determinations made in Cappy's bankruptcy proceeding. They claim simply that "the filing of the bankruptcy had no effect on the controlled group" because Cappy retained control of the Defendant companies throughout the bankruptcy proceedings. (Pl.'s Br. at 5.) This court agrees with bankruptcy court's determinations that Cappy's transfers of assets to the family trusts were
(continued...)

9

of January 1999, the defendant companies remained in common control, passing from Cappy to the bankruptcy estate. Thus, the first prong for joint and several liability is met. Defendants were under common control at the time that SCOFBP withdrew from the Fund in October 2001, incurring its withdrawal liability.

**II.     Trades or Businesses**

The second prong for joint and several liability requires the court to determine whether MCOF and MCRI constitute "trade[s] or business[es]" for ERISA purposes. Although the MPPAA does not define "trade or business," the Seventh Circuit has adopted the Supreme Court's test from *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987), "to determine whether an *enterprise* constitutes a trade or business." *McDougall v. Pioneer Ranch Limited Partnership*, 494 F.3d 571, 577 (7th Cir. 2007) (citing *Central States, Southeast and Southwest Areas Pension Fund v. White*, 258 F.3d 636, 642 (7th Cir. 2001)) (emphasis added). For an activity to be a trade or business under *Groetzinger*, an entity must engage in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity. *Groetzinger*, 480 U.S. at 35. "One purpose of the *Groetzinger* test is to distinguish trades or business from investments, which are not trades or business and thus cannot form a basis for imputing withdrawal liability under § 1301(b)(1)." *Fulkerson*, 238 F.3d at 895.

As an initial matter, Plaintiffs argue that the *Groetzinger* test is inapplicable here because MCOF and MCRI were established as limited liability companies. Because they are formal business organizations, Plaintiffs urge, the court should deem them trades or businesses *per se.* Plaintiffs' argument finds some support in the case law. *See, e.g., Central States, Southeast and Southwest Areas Pension Fund v. The One Stop Inc.*, No. 03 C 4414, 19-29 (N.D.Ill. July 18, 2007) (unpublished opinion) ("the *Groetzinger* test applies only in cases involving **individuals** engaged in

---

[8](...continued)
fraudulent and that the assets were properly part of the bankruptcy estate. The court need not further address issues of preclusion to resolve this motion.

'informal economic activities.'. . . [T]he analysis has no applicability with respect to corporations.") (quoting *Fulkerson*, 238 F.3d at 895.) In *Fulkerson,* the Seventh Circuit did indeed hint that formal business organizations were presumptively trades or business under the MPPAA:

> Section 1301(b)(1) presents no interpretive difficulties when it is used to impute withdrawal liability to another corporation or other formally recognized business organization that is under common control with the obligated entity. However, thorny questions can arise when informal economic activities are claimed to be a trade or business.

238 F.3d at 895. *Fulkerson* did present such "interpretive difficulties" because the case did not involve another "formally recognized business organization"; instead, the entities being sued for withdrawal liability were a husband and wife who were engaged in leasing real property. The Seventh Circuit explained that the mere possession of property by individuals, "be it stocks, commodities, leases, or something else, without more is the hallmark of an investment" and "passively holding investments without more cannot normally be considered to be a trade or business." *Fulkerson,* 238 F.3d at 895-96. The court did not explicitly state, however, whether the property of formally recognized business organizations was to be treated in the same manner.

Though neither party here cites to it, the Seventh Circuit ultimately addressed the question of whether *Groetzinger* applied to formal business organizations in the *Pioneer Ranch Limited Partnership* case.[9] 494 F.3d at 577. That case involved a married couple who had formed a limited liability partnership that owned and administered a cattle ranch that the couple used as a vacation home and retreat. *Id.* The couple claimed that, like the defendants in *Fulkerson*, the partnership was engaged in the passive activity of holding real estate, which the couple used for an exclusively personal purpose. In considering this argument, the Seventh Circuit opted not to take the *per se* approach for which Plaintiffs now advocate. Instead, the court applied the *Groetzinger* test to determine whether the partnership was engaged in a trade or business or whether it operated the

---

[9] Plaintiffs' omission of this authority is particularly curious, because McDougall and Central States were the plaintiffs in the *Pioneer Ranch* case.

ranch for "purely personal reasons." *Id.* The existence of a formal partnership, however, ultimately proved crucial under the court's application of *Groetzinger*. Specifically, the partnership agreement stated that the partnership's purpose was "to engage in the business of farming, ranching, and any agricultural pursuit or undertaking." *Id.* at 578. The Seventh Circuit said such language was "highly relevant" because it evidenced the defendants' "stated intention of forming a business" and "constitute[d] a declaration against interest." *Id.* at 577-78 (quoting *Connors v. Incoal, Inc.*, 995 F.2d 245, 254 (D.C. Cir. 1993)). The court stated: "[A] fact finder could reasonably consider the documentary evidence of the [defendants'] intent and conclude that they engaged in the activities on Pioneer Ranch for the primary purpose of income or profit and simply derived incidental personal benefit from Pioneer Ranch." *Id.* at 578. On this basis, the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the plaintiff fund.

The instant case presents undisputed facts that are substantially similar to those in *Pioneer Ranch.* The operating agreements for both MCOF and MCRI express an intent to establish trades or businesses. Both operating agreements read:

> The object and purpose of the Company and the general nature of the business it proposes to transact shall include all transactions of any or all lawful business for which limited liability companies may be formed under the laws of the Commonwealth of Kentucky. The character of the business which the company initially intends to conduct is to hold real estate and investments approved by the Manager.

(MLC 609, § 1.7, Ex. 9 to Cappy Dep.: MLC 675 § 1.7, Ex. 23 to Cappy Dep.) Moreover, Defendants' own admissions during the course of this litigation corroborate the apparent profit motive behind the companies. Though Defendants now contend that the companies are merely passive real estate holding companies, they have previously admitted that both MCOF and MCRI were created "for the primary purpose of generating income or profit." (Def.'s Resp. To Pl.'s Requests for Admission I ¶¶ 56, 64.)

In this case, moreover, there is evidence that the companies engaged in business-related

12

conduct, further confirming the conclusion that they were operating as trades or businesses. MCOF leased its property directly to SCOFBP. "Leasing property to a withdrawing employer is an economic relationship that could be used to so dissipate or fractionalize assets and thus avoid withdrawal liability. It furthers the purpose of the MPPAA, therefore, to hold that leasing property to a withdrawing employer is a 'trade or business.'" *Ditello*, 974 F.3d at 890 (collecting cases). MCRI leases a manufacturing facility that it owns to a third-party company. According to a tax return supplied by Plaintiffs, MCRI reported that it earned over $200,000 in rental income and spent $12,000 in business management fees in 1997. (Ex. 30 to Cappy Dep.) Both MCRI and MCOF applied for and were issued Federal Employer Identification Numbers, and both maintained offices, elected officers (Cappy), and kept formal records of activities and expenditures. (Def.'s Resp. to Pl.'s Requests for Admission II ¶¶ 54, 70; Ex 11 to Cappy Dep.; MLC 609, § 1.6, Ex. 9 to Cappy Dep.: MLC 675 § 1.6, Ex. 23 to Cappy Dep.) On its federal income tax returns for 1997 and 2000, MCRI reported that its principal business activity was "real estate" and claimed several business-related income deductions. (Ex. 30 to Cappy Dep.; Ex. 31 to Cappy Dep.) The claiming of such business deductions is "strong evidence" that MCRI's real estate activities constituted a trade or business. *Personnel Inc.*, 974 F.2d at 795.

Though neither company admits to having any permanent employees, both MCRI and MCOF employed professionals to provide legal, management and accounting services on a contract basis. Irving Jaffe, an accountant for another Cappy-owned company by the name of MLC Holdings Inc., testified that MLC Holdings regularly provided management and accounting services for MCRI and MCOF between 1994 and 1999. (Jaffe Dep. 21-22, 44)[10] These services, Jaffe testified, included the receipt and acceptance of rent checks and the payment of mortgages on the companies' behalf.

---

[10] For all intents and purposes, Jaffe may be characterized as an employee of MCOF or MCRI. Jaffe testified that MLC Holdings operated out of the same office address as both MCRI and MCOF. He also said that, at some point, his official title was 'President' of MCOF, though he could not recall any special duties associated with that position. (Jaffe Dep. at 45.)

(*Id.* at 29.) It also included, on occasion, servicing tenants or contacting the Internal Revenue Service. (*Id.* at 29-31; 47-49,)

Though Defendants claim that MCRI and MCOF were merely passive holding companies, the court concludes that there is no genuine dispute of material fact as to whether those companies were actively operating a for-profit enterprise through the continuous services of MLC Holdings. Defendants continuously maintained and operated real estate investment businesses. They were not engaged in a passive investment or some other "sporadic activity," such as "a hobby, or an amusement diversion." *Groetzinger*, 480 U.S. at 35. Rather, the undisputed evidence is sufficient to establish that Defendants were engaged in a regular and continuous activity with the primary purpose of generating income or profit.

## **CONCLUSION**

Defendants were under common control and engaged in a trade or business at the time that SCOFBP incurred withdrawal liability to the Fund. As such, Defendants are jointly and severally liable for SCOFBP's withdrawal liability. Plaintiffs' motion for summary judgment [209] is granted. Defendants' cross-motion for summary judgment [143] is denied.

ENTER:

Dated: September 8, 2010

_____
REBECCA R. PALLMEYER
United States District Judge